# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **STEWART J. SMITH,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:18-cv-00277-TES** |
| **UNITED STATES OF AMERICA,** | |
| *Defendant.* | |

## ORDER OF DISMISSAL

During his opening statement at his confirmation hearing, now-Justice Gorsuch made some very insightful comments about judges and the toll certain cases take on them:

> As a judge now for more than a decade, I have watched my colleagues spend long days worrying over cases. Sometimes, the answers we reach are not the ones we personally prefer. Sometimes the answers follow us home and keep us up at night. But the answers we reach are always the one we believe the law requires. [1]

Mr. Smith's case is one of those cases that has certainly followed me home at night, causing me great worry, sleepless nights, and endless dread. It should be crystal clear that the answer I reach below is surely not the answer I prefer, but I don't get to

---

[1] *Confirmation hearing of Neil M. Gorsuch*, Before the Senate Judiciary Committee, 115th Congress (2017).

choose. Rather, my only choice is to apply the law that Congress actually wrote, not the law that I wish Congress had written. In this case, when I objectively and dispassionately apply the text of the Veterans' Judicial Review Act to the admittedly sympathetic facts of this case, fidelity to the judicial role compels me to dismiss Mr. Smith's case for a lack of subject-matter jurisdiction.

## I.     <u>INTRODUCTION</u>

Plaintiff Stewart J. Smith ("Mr. Smith") is a veteran of the United States Army who receives benefits through the U.S. Department of Veterans Affairs, Veterans Health Administration (the "VA"). [Doc 1 at ¶¶ 1, 2, 7, 8]. Mr. Smith filed this action seeking damages from the United States of America due to alleged negligence on the part of the VA in treating Mr. Smith for cancer, which has now metastasized to other parts of his body and recurred twice. *See generally* [Doc. 1]. The Government does not doubt that Mr. Smith has cancer or that it has recurred. Rather, the Government argues that district courts do not have subject-matter jurisdiction over claims such as Mr. Smith's due to limitations created by the Veterans' Judicial Review Act ("VJRA"), 38 U.S.C. § 511, and, therefore, moves this Court to dismiss the case. [Doc. 24].

Under the VJRA, complaints regarding benefits issues can only be brought via the VA appeals process. *See* Section II(B), *infra*. Thus, district courts can hear *only* those claims which do not "require the court to intrude upon the VA's exclusive jurisdiction over the administration of veterans' benefits." For the reasons that follow, the Court

finds that adjudicating Mr. Smith's claims would indeed require the court to encroach upon the exclusive jurisdiction conferred by the VJRA, and, therefore, the Court **GRANTS** the Government's Motion and **DISMISSES** this case **without prejudice** for want of subject-matter jurisdiction.

## II.     FACTUAL SUMMARY

### A.     Mr. Smith's Healthcare through the VA

Mr. Smith is a veteran of the United States Army, and, for the past 30 years, has received his primary medical care from the VA and, since 2004, at the Carl Vinson VA Medical Center in Dublin, GA (the "Dublin VA"). [Doc. 24-2, ¶¶ 1–2].[2] On October 24, 2013, Mr. Smith sought care at the Coliseum Medical Center emergency room in Macon, Georgia, after several days of persistent severe pain in the right side of his head, specifically behind his ear and eyes. [*Id.* at ¶ 3]. Additionally, his tongue was swollen, causing him to slur his speech. [*Id.*]. The physician who attended Mr. Smith that day believed that Mr. Smith's Neurontin pills caused the issue; instructed Mr. Smith to stop taking the pills; and told him to follow up with his physician at the VA, Dr. Puppala. [*Id.* at ¶¶ 3–4].

The next day, Mr. Smith contacted Dr. Puppala's office, and was informed he could not get an appointment until December 16, 2013. [*Id.* at ¶ 4]. At the December 16th

[2] Unless otherwise stated, all references to [Doc. 24-2] (Defendant's Statement of Material Facts) also refer to the corresponding paragraphs of [Doc. 35-2] (Plaintiff's Response to Defendant's Statement of Material Facts).

appointment, Mr. Smith reported that his tongue had remained dry and swollen since the October emergency room visit and that the right side of his neck had started swelling a few weeks prior to the visit; Dr. Puppala confirmed the swelling and ordered a CT scan of Mr. Smith's neck. [*Id.* at ¶¶ 5–6]. However, the Dublin VA did not schedule a neck CT scan until approximately one month later, on January 14, 2014. [*Id.* at ¶ 7] The January 14th CT scan revealed a tumor in Mr. Smith's throat at the base of his tongue that had spread to three lymph nodes on the right side of his neck. [*Id.* at ¶ 8]. While the radiologist's ability to discern more about the tumor was limited because the CT scan did not utilize contrast, the radiologist nevertheless noted that the scan was "worrisome for underlying head and neck malignancy." [*Id.*].

On January 16, 2014, upon receiving the scan results, Dr. Puppala ordered a non-VA consult for Mr. Smith with an outside ENT specialist and entered a "Non-VA Care Coordination Note" into Mr. Smith's electronic medical record requesting the consult and detailing the need for the non-VA care because the VA did not have the ability to treat the condition in-house. [*Id.* at ¶ 10]. That same day, she informed the VA schedulers that Mr. Smith needed an appointment "ASAP" to discuss the scan, and Mr. Smith was scheduled for an appointment to see her on January 22, 2014. [*Id.* at ¶ 9]

At the January 22nd appointment, Dr. Puppala shared the CT scan results with Mr. Smith, whose neck was still swollen, and again ordered that a non-VA ENT consult be approved and scheduled. [*Id.* at ¶ 11]. Two days later, the non-VA ENT consult for

Mr. Smith was "authorized by Fee." [*Id.* at ¶ 12]. That same day, a Non-VA Care administrative scheduler, or Fee PSA (Program Support Assistant), acknowledged receipt of the authorization. [*Id.* at ¶ 13]. According to Mr. Smith's electronic medical records, no further action was taken on the ENT consult order and/or the Care Coordination Note until February 21, 2014 (28 days later), when "information [was] sent to ENT Center of Central Georgia for scheduling." with no further notation of what information was sent or what action was taken. [*Id.* at ¶ 14].

On March 6, 2014, Mr. Smith, having been told by the ENT Center of Central Georgia ("The ENT Center") that they were still awaiting VA approval and authorization, requested that the Dublin VA provide the ENT Center with the authorization, which they did the next day. [*Id.* at ¶¶ 15–16]. On March 11, 2014—54 days after Dr. Puppala ordered that Mr. Smith see an outside doctor—ENT specialist Dr. Sanford Duke finally examined Mr. Smith and noted that Mr. Smith had a palpable mass on the right side of his neck and the base of his tongue with symptoms including dysphagia (difficulty swallowing), numbness on the side of his face and tongue, dry mouth, mucous after drinking, affected speech, and fatigue. [*Id.* at ¶ 17].

Dr. Duke reviewed the CT scan and performed a fine needle aspiration of the tongue and throat mass for pathological examination. [*Id.*]. Pathology confirmed that Mr. Smith had cancer.[3] [*Id.* at ¶ 18–19]. Dr. Duke told Mr. Smith of his diagnosis at his

---

[3] More specifically, the test indicated "Malignant Cells present, poorly differentiated carcinoma."

March 13, 2014 follow-up appointment, and also explained to Mr. Smith the urgent need for a "full workup" before surgery to remove the tumor, including a CT scan with contrast and a PET scan. [*Id.*].

In order for the VA to cover the cost of Mr. Smith's treatment, VA policy required the scans to be completed at a VA facility and required the VA to approve the non-VA surgery. [*Id.* at ¶ 20]. The Dublin VA performed the CT scan with contrast on March 28, 2014, and the VAMC in Atlanta completed a PET scan on April 7, 2014. After a week of waiting, Mr. Smith had not received the PET scan results and called the Dublin VA requesting the results. Furthermore, the VA had yet to approve Mr. Smith's surgery. [*Id.* at ¶ 21].

On April 17, 2014, the VA noted in Mr. Smith's records that it "called Vendor to request records - ENT Center of Central Georgia." [*Id.* at ¶ 22]. On April 22, 2014, Mr. Smith again called to request an update and seek help getting care, and two days later also sent an email to Dr. Puppala expressing concern that he had not been provided the interpretation of his PET scan results (another 17 days had elapsed) nor had the VA approved further treatment (such as surgery and radiation) from Dr. Duke. [*Id.* at ¶ 23]. The next day, April 25, 2014, Dr. Puppala noted the findings of Mr. Smith's PET scan on the Non-VA Care Coordination Notes, specifically that the "patient needs follow up with [his] ENT doctor who requested the PET scan." [*Id.* at ¶ 24]. Further, Dr. Puppala

called and emailed the Non-VA Fee Department seeking approval for Mr. Smith's surgery and other non-VA care Mr. Smith needed from Dr. Duke. [*Id*.].

Mr. Smith obtained legal counsel to assist in getting treatment, and his counsel contacted then-Congressman John Barrow, who in turn directly contacted the VA on Mr. Smith's behalf. [*Id.* at ¶ 25]. After getting this Congressional help, the VA approved Mr. Smith's surgery on May 13, 2014. [*Id*.]. When Mr. Smith underwent surgery on May 19, 2014, Dr. Duke determined that the tumor had grown during the intervening delay so that it now encompassed his carotid artery, preventing Dr. Duke from completely removing the cancer. [*Id*. at ¶ 26].

Following surgery (May 29, 2014), Mr. Smith's non-VA providers confirmed his plan of care, to include chemotherapy and radiation treatment, and set it to begin on June 3, 2014; however, when June 3rd came, the VA again failed to approve Mr. Smith's chemotherapy and radiation treatment. [*Id*. at ¶ 27]. Thus, on June 4, 2014, Mr. Smith emailed Dr. Puppala seeking her assistance in getting the VA to approve and authorize his radiation treatments. [*Id*.]. However, on June 17, 2014, when Mr. Smith attended his appointment with his Non-VA physician, Dr. Schnell, his treatment was "delayed until next week secondary to waiting on radiation oncology to have approval from the VA to start radiation," and Mr. Smith waited yet another week to return and begin treatment. [*Id*. at ¶ 28].

On June 19, 2014, after a full month had come and gone since his surgery without the VA approving his cancer care plan, Mr. Smith and his attorney held a press conference to inform the media "of the unacceptable and inexcusable neglect by the VA" in connection with the VA's handling of Mr. Smith's non-VA treatments. [*Id*. at ¶ 29]. On June 25, 2014, the VA finally authorized Mr. Smith's post-surgery care plan, giving Mr. Smith seven weeks of chemotherapy and radiation treatment. [*Id*. at ¶¶ 30-31].

By early 2015, Mr. Smith's physicians believed the cancer to be in remission; however, a routine PET scan in September of 2017 revealed a nodule on Mr. Smith's lung that further testing revealed to be cancer of the same type identified in Mr. Smith's throat. [Doc. 35 at p. 1]. In May 2018, Mr. Smith underwent another surgery to remove the new tumor and a portion of his lung. [*Id*. at pp. 1–2]. Then, in 2019, Mr. Smith's physician identified another area of concern, and Mr. Smith underwent further chemotherapy and radiation treatment for this second cancer recurrence. [*Id*. at p. 2].

B.    <u>**Mr. Smith's Attempts to Obtain an Administrative Remedy**</u>

Mr. Smith attempted to address this issue through administrative remedies prior to filing suit in district court. *See* [Doc. 1-1]; [Doc. 1-2]. On December 21, 2015, the VA Office of the General Counsel ("OGC") responded via letter to Defendant's

administrative tort claim, [4] stating that they had "thoroughly investigated the facts surrounding [the] claim in which [Mr. Smith] alleged that [his] healthcare providers negligently failed to timely diagnose and treat [his] tongue cancer beginning January 2014" but found "no evidence that [he] suffered an injury as a result of the care [he] received…" and were therefore denying his claim. [Doc. 1-1 at p. 1]. That letter informed Mr. Smith of his options to "file a request for reconsideration of your claim with the VA General Counsel…" or "in the alternative…[to] file suit directly under the FTCA, 28 U.S.C. §§ 1346(b) and 2671-80…." [*Id*.]. [5]

Mr. Smith requested a reexamination of his grievance, and, on February 2, 2018, the OGC responded via letter stating that the office—with the assistance of medical professionals—had reconsidered Mr. Smith's claim. [Doc. 1-2]. As before, the OGC "found no evidence of any negligent or wrongful act or omission on the part of a [VA] employee acting within the scope of his or her employment that caused or contributed to any injury to Mr. Smith." [*Id*.]. The letter further declared

> [this] denial is the last action we will take on this tort claim. If you wish to pursue this claim further, you may file suit in Federal district court…. If you file suit, you should name the United States as the defendant, not VA or any other Department or Agency. Please note that the FTCA claims are governed by a combination of Federal and state law….VA attorneys handling FTCA claims work for the Federal

---

[4] The record includes only the two responses received from the VA, not the two requests Plaintiff apparently made.

[5] "Federal Tort Claims Act" ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-80.

government and cannot provide advice regarding the impact of state laws of state filing requirements."

[*Id.*] (citing 28 U.S.C. § 2401(b)).

### C.    Mr. Smith's Claims in the Present Action

Mr. Smith did indeed file suit in this court under the FTCA. [Doc. 1]. He claims that "the VA [] repeatedly and recklessly failed to timely schedule medical appointments and testing and failed to authorize [his] cancer diagnosis care and treatment." [*Id.* at ¶¶ 3, 26]. Mr. Smith contends that "had the cancer been properly and timely diagnosed and his treatment been authorized in a timely manner, the cancer would not have spread to [his] lymph nodes greatly decreasing his chance for a cure" and "[h]ad the VA  provided  Mr. Smith timely medical appointment and testing and timely approved his non-VA care, then more likely than not, Mr. Smith's cancer could have been cured in 2014." [*Id.* at ¶ 27]. Specifically, Mr. Smith alleges that

> various personnel at the VA, were negligent in regards to the care and treatment of Mr. Smith, including but not limited to:
>
> (a) Failing to ***timely schedule*** medical appointments, diagnostic testing, and treatment for Mr. Smith;
> (b) Failing to ***timely approve and/or authorize*** medical treatment that was ordered by Mr. Smith's treating medical providers;
> (c) Failing to ***timely approve and/or authorize payment*** of medical treatment that was ordered by Mr. Smith's treating medical providers;
> (d) Failing to ***timely act*** in the face of Mr. Smith's concerning symptoms and test results, resulting in ***inexcusable delay*** in the diagnosis, at a time when his cancer was treatable and curable;

> (e) Otherwise failing to meet the appropriate and applicable medical standards of care;
>
> (f) Failing to follow its own policies, procedures, and protocols for **timely scheduling and approving medical appointments and authorizing payment** of non-VA services; and
>
> (g) Being otherwise negligent.

[*Id.* at ¶ 38] (emphasis added). Mr. Smith goes on to argue that these alleged negligent acts proximately caused Mr. Smith's "medical expenses, lost income, and other expenses" presently and in the future and caused Mr. Smith to "lose his chance for a cure [causing] his life expectancy [to be] greatly diminished." [*Id.* at ¶¶ 40–41]. Overall, the gravamen of Mr. Smith's complaint is clearly the <u>timeliness</u> of his care through the VA; indeed he mentions timeliness issues more than a dozen times in his complaint.[6] In contrast, neither Mr. Smith nor the physician whose affidavit he attached to his complaint raise any critique with the quality of the VA healthcare received—beyond the obvious delay in care.[7]

---

[6] *See* [Doc. 1 at ¶ 5] ("VA scheduling and fee service approvals"); [*Id.* at ¶ 12] ("did not schedule…until a month later … no excuse for delay [] ….") [*Id.* at ¶ 14] ("yet he was not given an appointment… until a week later.) [*Id.* at ¶ 17] ("still awaiting VA approval and authorization" … "nearly 2 months since the … CT scan result … It had been nearly 5 months since his symptoms first started."); [*Id.* at ¶¶ 20-22] ("The CT scan…over two weeks after it was ordered, and the PET scan… [three weeks after it was ordered] …. over a month after … still did not have the results…"); [*Id.* at ¶ 24] ("…surgery with Dr. Duke was finally approved two months after Dr. Duke ordered it."); [*Id.* at ¶ 25] ("…[Plaintiff] had waited nearly seven months for the VA to approve and provide him the critical medical care…"); [*Id.* at ¶ 26]; [*Id.* at ¶ 27]; [*Id.* at ¶ 29] ("Another two weeks passed still without approval of his treatments…"); [*Id.* at ¶ 31] ("treatments were authorized…after fighting the VA for eight months").

[7] *See* [Doc. 1 at ¶ 43] ("This cause of action primarily raises claims of ordinary negligence, and not professional negligence [but] out of an abundance of caution and although not required, attached…an affidavit of Robert Ferris, M.D. setting forth at least one negligent act or omission claimed to exist and the factual basis for each such claim.")

The Government contends that the VJRA precludes this Court from exercising jurisdiction over Mr. Smith's claims. As discussed in greater detail below, the VJRA provides the sole and exclusive remedy for veterans who have grievances regarding benefits decisions. *See* Section II(B), *infra.* Thus, the Government moves the Court to dismiss the action for lack of subject-matter jurisdiction, or, in the alternative, to issue summary judgment against Mr. Smith. [Doc. 24].

## III.     STANDARD OF REVIEW

### A.  Dismissal Due to Lack of Subject-Matter Jurisdiction

Under the Federal Rules of Civil Procedure, parties may assert the defense that the Court lacks subject-matter jurisdiction to hear a case, and, if the Court finds that subject-matter jurisdiction is indeed lacking, it **must** dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3). However, "it is extremely difficult to dismiss a claim for lack of subject-matter jurisdiction. [T]he test is whether the cause of action alleged is so patently without merit as to justify ... the court's dismissal for want of jurisdiction." *Simanonok v. Simanonok*, 787 F.2d 1517, 1519 (11th Cir. 1986) (citing *Duke Power Co. v. Carolina Environmental Study Group*, 98 S.Ct. 2620, 2629 (1978)).

"The district court has the power to dismiss for lack of subject-matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *McElmurray v. Consol.*

*Gov't of Augusta–Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting

*Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.1981))[8]  Typically, attacks on subject-

matter jurisdiction under Rule 12(b)(1) can be made categorized as a "facial attack" or

"factual attack."  *See e.g. Douglas v. United States*, 814 F.3d 1268, 1275 (11th Cir. 2016);

*McElmurray*, 501 F.3d 1244, 1251. "A facial attack on the complaint require[s] the court

merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter

jurisdiction, and the allegations in his complaint are taken as true for the purposes of

the motion. *McElmurray*, 501 F.3d 1244, 1251 (quoting *Lawrence v. Dunbar*, 919 F.2d 1525,

1529 (11th Cir.1990)). "By contrast, a factual attack on a complaint challenges the

existence of subject matter jurisdiction using material extrinsic from the pleadings, such

as affidavits or testimony..."*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524

F.3d 1229, 1233 (11th Cir. 2008).  In considering whether to evaluate a motion as a facial

or factual attack, the Eleventh Circuit tells us that "the finding of subject-matter

jurisdiction should be made together with a merits determination under Rule 56 when,

as will often be the case, the two are sufficiently 'intertwined.'" *See Douglas*, 814 F.3d

1268, 1281 (Tjoflat, J. concurring and noting specifically the likelihood of this issue in

cases brought against the United States). When, as here, "[a defendant's] motion to

dismiss, [] relies upon extrinsic evidence and is not limited solely to the pleadings, [it] is

---

[8] The Eleventh Circuit has adopted as binding precedent, all decisions of the former Fifth Circuit announced prior to October 1, 1981. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981). The *Williamson* court issue its opinion May 20, 1981, and, thus, it is binding in this circuit. *Williamson*, 645 F.2d 404.

a factual attack." *Watson v. Spincker*, No. 1:08-CV-97 WLS, 2010 WL 3824060, at *2 (M.D. Ga. Sept. 21, 2010) (citing *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n. 5 (11th Cir. 2003).

Here, both parties have filed and argued evidence outside the complaint:  Mr. Smith maintains that the court should consider testimony and affidavits categorizing the delays in his treatment as malpractice and argues that any benefits determination issue ended from the moment Dr. Puppala acknowledged that the VA could not manage Mr. Smith's cancer treatment in-house.   *Hearing before the Honorable Tilman E. Self, III, (*M. D. Ga. February 25, 2020, 10:07–22) (audio recording on file with clerk) Defendant's Motion to Dismiss or in the Alternative for Summary Judgment, [Doc. 24];[9] *see also* [Doc. 35]. Conversely, the Government posits that those same depositions and affidavits further confirm that Mr. Smith has indicated no failure on the part of a particular medical professional but, rather, failure of the VA system itself,  which the Government argues, precludes this Court from adjudicating due to VRJA limitations. *Hearing on MTD*, 10:07–22; *see also* [Doc. 24-1].

### B.  <u>The Veterans' Judicial Review Act</u>

The VJRA states that the "Secretary [of Veterans Affairs] shall decide *all questions of law and fact* necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of

---

[9] Hereinafter cited as *"Hearing on MTD"*

veterans." 38 U.S.C. § 511(a) (emphasis added). However, those wishing to dispute the

Secretary's decisions are not without remedy, because

> [the VJRA] stipulates that determinations of the Secretary
> may be appealed to the Board of Veterans' Appeals ("Board"),
> whose ruling becomes the final decision of the Secretary.
> Decisions of the Board may then be reviewed exclusively by
> the United States Court of Veterans Appeals, an Article I court
> established by the VJRA. Decisions of the Court of Veterans
> Appeals are in turn appealable solely to the United States
> Court of Appeals for the Federal Circuit, which has "exclusive
> jurisdiction to review and decide any challenge to the validity
> of any statute or regulation or any interpretation thereof ...
> and to interpret constitutional and statutory provisions, to the
> extent presented and necessary to a decision." The judgment
> of the Federal Circuit Court of Appeals is then subject to
> review by the United States Supreme Court by writ of
> certiorari….Facial constitutional attacks on regulations
> promulgated by the Secretary may be pursued in one of two
> ways—either in accordance with the procedure set forth in
> the VJRA, or directly in the Federal Circuit Court of Appeals.

*Hall v. U.S. Dep't Veterans' Affairs*, 85 F.3d 532, 534 (11th Cir. 1996) (citing 38 U.S.C. §§

502, 7104(a), 7251, 7252(a), 7266(a); 7292(a); 7292(c); and *Zuspann v. Brown*, 60 F.3d 1156,

1158–59 (5th Cir.1995), *cert. denied*, 116 S.Ct. 909 (1996)(internal citations omitted)).

Hall is the only published opinion in which the Eleventh Circuit has analyzed the

VJRA's jurisdictional scheme. *See Hall*, 85 F.3d 532 (holding that dismissal *sua sponte* for

lack of subject-matter jurisdiction under the VJRA was proper where a veteran alleged

the reduction in his disability benefits constituted a tort and violated numerous

constitutional provisions). However, there are unpublished[10] opinions from the

Eleventh Circuit which do discuss the more-nuanced issue of tort allegations arising

from the quality of care received from the VA. *See e.g. Milbauer v. United States*, 636 F.

App'x 556 (11th Cir. 2016) (holding that that the court did not have jurisdiction over

plaintiff's allegations that the VA failed to follow its own procedures); *Milbauer v.*

*United States*, 587 F. App'x 587, 590 (11th Cir. 2014) (holding that the court did not have

jurisdiction over plaintiff's allegations of medical malpractice related to a 10-month

delay caused by his request for an "open" MRI rather than one performed in a typical

MRI machine). [11]

 In deciding the *Milbauer* cases, the Eleventh Circuit relied upon the approach

taken by the D.C. Circuit. *See* 587 F. App'x 587; 636 F. App'x 556; *Thomas v. Principi*, 394

F.3d 970, 972 (D.C. Cir. 2005); *Price v. United States*, 228 F.3d 420, 421 (D.C. Cir. 2000)).

According to that standard, a district court should determine subject-matter jurisdiction

by examining the paramount question: would adjudicating the plaintiff's claim require

the district court to first determine whether the VA acted properly in granting or

denying a benefits request? *Thomas*, 394 F.3d 970, 974. However, the *Thomas* court noted

---

[10] While unpublished opinions such as these "are not considered binding precedent, [] they may be cited as persuasive authority." U.S.Ct. of App. 11th Cir. R. App. P. 36-2.

[11] These two cases involve the same Plaintiff. In this Order, the Court refers to the first of these two related cases *Milbauer v. United States*, 587 F. App'x 587, 590 (11th Cir. 2014) as "*Milbauer I*" and the subsequent case of *Milbauer v. United Sta*tes, 636 F. App'x 556 (11th Cir. 2016) as "*Milbauer II*" or, in the alternative, refers to *both* cases collectively as "*Milbauer*" where appropriate.

> [t]he regulatory definition of 'benefit,' which includes 'any ... service, ... entitlement to which is determined under laws administered by the Department of Veterans Affairs pertaining to veterans.'" ... should not be interpreted so broadly as to assume that *all* action or inaction by the VA represents a type of 'service,' and therefore automatically constitutes a 'benefit.'

*Id.* at 975 (emphasis added) (quoting 38 C.F.R. § 20.3(e)). Thus, a plaintiff's claims *do* fall within the jurisdiction of a district court *if* those claims "raise no questions of law [or] fact necessary to a decision by the Secretary." *Thomas*, 394 F.3d 970, 974–75 (citing *Price*, 228 F.3d 420); *see also, Anestis v. United States*, 749 F.3d 520, 528 (6th Cir. 2014)(holding that it was error for the district court to dismiss a claim that was "wholly unrelated to any benefits determination" but rather hinged on a VA hospital's duty to provide care in emergent situations to *anyone*, regardless of any VA benefits eligibility).

However, "a plaintiff may not circumvent the VJRA's jurisdictional limitations by cloaking a benefits claim in [other] terms." *Milbauer v. United States*, 587 F. App'x 587, 590 (11th Cir. 2014). *See also, e.g. Tunac v. United States*, 897 F.3d 1197, 1205–06 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 817 (2019); *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1025 (9th Cir. 2012) (holding that the VJRA barred a class action suit alleging that slow processing procedures led to unconstitutional delay in veterans' care through the VA); *Turner v. United States*, 501 F. App'x 840, 843 (10th Cir. 2012); *Mehrkens v. Blank*, 556 F.3d 865, 867–68 (8th Cir. 2009); *Zuspann*, 60 F.3d 1156, 1158;; For example, the Eleventh Circuit ultimately concluded in *Milbauer II* that the plaintiff's claim was a benefits issue

because [plaintiff] sought a particular benefit—to have the VA pay for an open MRI performed at a non-VA facility—and he complained the process of obtaining that benefit caused the delay in his [torn rotator cuff] diagnosis. The district judge also could not have adjudicated [plaintiff]'s claim without first determining whether he was entitled to have an outside MRI and whether the Brooklyn VA[12] properly followed its policy in processing his request.

*Milbauer II*, 636 F. App'x at 558-559.

In *Milbauer I,* the Eleventh Circuit adopted the Eighth Circuit's stance that "there is no meaningful legal difference between a delay of benefits and an outright denial of benefits" for purposes of the VJRA. 587 F. App'x 587 (quoting *Mehrkens*, 556 F.3d 865, 870.[13]  The Ninth Circuit, following its own precedent as well as that of sister circuits, specifically addressed the issue of delay in diagnosis and determined

[district courts] do not, [] , have jurisdiction over the complaint's allegations that [plaintiff's harm] was caused by the VA's failure "to schedule [plaintiff] for immediate (or even timely) treatment after the deterioration of his condition" or its failure "to schedule [plaintiff] for immediate [treatment] after the results of his [] biopsy…" and similar allegations relating to the negligence in scheduling appointments and treatment. *As currently drafted, these allegations do not give rise to a reasonable inference that VA medical professionals breached their duty of care, but rather seek relief for the*

---

[12] Although the district court found venue to be proper in the Eleventh Circuit because Plaintiff had relocated since the time of his allegedly tortious treatment, it was a VA facility in Brooklyn, NY that had allegedly provided Plaintiff with inadequate care.

[13] This Court notes that the "delay of benefits" referred to by the Eighth Circuit was the delay of 12 years from the time the veteran was initially denied benefits until he was eventually granted benefits, which the Eleventh Circuit equated to the *Milbauer I* delay of 10 months during which Plaintiff sought approval for a special non-VA "open MRI" rather than a typical VA facility MRI due to his claustrophobia. 556 F.3d 865; 587 F. App'x 587.

> type of administrative negligence in scheduling appointments that
> must be channeled through the VJRA.

*Tunac*, 897 F.3d 1197, 1205–06 (emphasis added) (citing *Veterans for Common Sense*, 678 F.

3d 1013, 1026–28).

### IV.    DISCUSSION

The Court categorizes the Government's attack on subject-matter jurisdiction as a

factual one and, accordingly, considers not only the pleadings, but also the extrinsic

evidence relied upon by the parties. *Watson*, 2010 WL 3824060 at *2 (citing *Morrison*, 323

F.3d at 925 n. 5 (11th Cir. 2003)); [Doc. 24]; [Doc. 35]; *Hearing on MTD.* In reviewing the

complaint, affidavits, and depositions, the Court finds that Mr. Smith's claims are far

from simple, and Mr. Smith's treatment timeline is inexorably connected to VA benefits

determinations and VA policy enforcement. Here, as in *Milbaur* and *Tunac*

(notwithstanding that Mr. Smith phrases the alleged delays in scheduling and

authorization of treatment as tort claims that could proceed under the FTCA), the Court

finds that, in actuality, his complaint "raise[s] a benefits issue, not a [tort] claim" since

"the judge would be required to determine whether the [] VA followed Policy…" in

processing and scheduling the various orders related to Mr. Smith's treatment. *Milbauer*

*II*, 587 F. App'x 587, 592.

Even accepting as true Mr. Smith's position that more expedient diagnosis and

treatment through competent scheduling practices would have resulted in a more

favorable prognosis, the Court would still have to overstep the limitations imposed by

the VJRA in order to examine the process of administering VA healthcare benefits. To illustrate, the Court has created the following timeline regarding the various delays in Mr. Smith's treatment at the Dublin VA:

- 52 days passed between the date Mr. Smith requested an appointment with Dr. Puppala and the date on which he was seen;
- 29 days passed between the date Dr. Puppala ordered a CT scan and the date the Dublin VA performed the CT scan;
- 8 days passed between the date of Mr. Smith's CT scan flagging the mass on his neck as "worrisome for…malignancy" and his appointment with Dr. Puppala to review the scan;
- 35 days passed between the date Dr. Puppala ordered a non-VA ENT consult and Mr. Smith's appointment with Dr. Duke;
- 14 days passed between the date on which Dr. Duke confirmed Mr. Smith's cancer diagnosis and ordered an updated CT scan and PET scan to prepare for surgery and Mr. Smith getting the updated CT scan—and then an additional 10 days passed before the PET scan;
- 36 days passed between the date the updated scans were completed to the time surgery was scheduled;
- 38 days passed between the date of Mr. Smith's surgery and the date on which his post-surgery chemotherapy and radiation treatments were approved.

*See generally* [Doc. 1]; [Doc. 24]; [Doc. 35]; Section I(A), *supra.* As shown, 202 days— nearly *seven months*—elapsed from the date Mr. Smith first asked to see his doctor about the pain in his head and lump on his neck until the Dublin VA approved his post-surgery cancer treatment. *Id.*

Mr. Smith passionately (and effectively) argues that the VA negligently failed to appreciate the gravity of his medical situation and then compounded its negligence by not "moving him to the front of the line." *Hearing on MTD.* However, for the Court to

look into his claims, the Court would necessarily have to analyze exactly what benefits he was

entitled to receive and, just as importantly, when he was to receive them. [14]  Any

analysis of delay in the delivery of benefits and the accompanying detrimental effect (if

any) would likewise require the trier of fact to make determinations of law and fact that

Congress has determined to be sole province of the Secretary, the Board of Veterans

Appeals and the subsequent appeals process prescribed by the VJRA. *See* Section II(B),

*supra.*

Ultimately, the Court finds that it simply cannot adjudicate this case, as pled and

argued, without first having to make benefits determinations and determining whether

the VA followed its own policies—neither of which Congress has determined this Court

has subject-matter jurisdiction to decide. Accordingly, after examining the language of

the VJRA in conjunction with the persuasive case law of this (and other) circuits, the

---

[14] For example, the Court would have to answer questions such as:

> How much of the delay can be attributed to the VA determining whether Mr. Smith was entitled to the specific benefit of non-VA care?
> What is the VA policy for authorization of non-VA care and was it followed in Mr. Smith's case?
> What is the VA policy regarding the timeliness of scheduling appointments and seeing veterans and was it followed in Mr. Smith's case?
> What is the VA policy for communication with non-VA healthcare providers and was it followed in Mr. Smith's case?

This list isn't meant to be exhaustive, but merely illustrative. However, it is key to note that all of these questions relate to the availability of certain benefits and the VA's policies in administering or delivering those benefits.

Court finds that it lacks subject-matter jurisdiction over Mr. Smith's claims and

**DISMISSES**[15] the case **without prejudice**.  The Court reminds Mr. Smith that the

foregoing ruling is "not a discussion of the merits of his claims" and hopes that he may

be able to find relief within the administrative scheme designed and implemented by

Congress through the VJRA. *See Watson*, WL 3824060 at *3.

So ORDERED this 9th day of March, 2020.

s/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[15] It appears to the Court that Mr. Smith clearly suffered because of the scheduling nightmares created by the VA's various labyrinths of bureaucracy. While I am constrained to dismiss this case because of the VJRA, as a fellow Army veteran, I am angry and embarrassed at Mr. Smith's treatment. If it is later determined that veterans such as Mr. Smith must simply endure these sorts of potentially life-threatening delays at the VA's various clinics, we should all be ashamed. Surely, we can do better.